PUBLISHED

*VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **7th** *day of* **January, 2020**.

Kevin Lamont Knight, a/k/a
  Suge Knight,                                                                          Petitioner,

 against               Record No. 1162-18-1

Commonwealth of Virginia,                                                        Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges O'Brien, Russell, and Senior Judge Clements

   Kevin Lamont Knight, also known as Suge Knight, petitions this Court for a Writ of Actual Innocence pursuant to Chapter 19.3 of Title 19.2 of the Code of Virginia. A jury convicted Knight of first-degree murder, robbery, and two counts of using a firearm in the commission of a felony in the Circuit Court of the City of Norfolk. By final order of January 28, 2004, the trial court sentenced Knight to life imprisonment plus fifteen years, consistent with the jury's verdict.

   Knight contends that he is innocent of the offenses and is entitled to relief based upon the purported recantations of his accomplices and two informants. Knight also argues that former Norfolk Police Detective Robert Glenn Ford used "unscrupulous tactics" to secure his convictions. He notes that Ford was convicted in federal court of bribery. Knight contends that he is entitled to an evidentiary hearing on the proffered recantations following the Supreme Court of Virginia's decision in Dennis v. Commonwealth, 297 Va. 104 (2019). The Attorney General has moved to dismiss Knight's petition.

BACKGROUND

   At 11:12 p.m. on August 16, 2002, Norfolk Police Officer Whiteside and his partner responded to a call of "shots fired" at 1539 Palmetto Street in Norfolk; the officers arrived at 11:18 p.m. Officer Whiteside saw the victim, later identified as Troy Jordan, lying on the driveway of 1533 Palmetto Street with a window blind wrapped around his feet. Jordan had an obvious gunshot wound to his head. Officer Whiteside secured

the entire perimeter. He noticed that the window of the rear door of the duplex near Jordan's body was "completely broken out," with curtains lying there and glass on the porch.

The rescue squad arrived almost immediately behind the officers. Jordan was lying in the driveway in the fetal position. There was a large pool of blood beneath Jordan's head; however, he had respirations and a pulse. Paramedics transported Jordan to the hospital, but he died from his injuries. The medical examiner testified that Jordan died from a gunshot wound to the back of the head and that there "was no evidence of close range fire on the gunshot wound." The direction of fire was "from back to front." Jordan also had sustained multiple blunt force injuries of his head, torso, and legs. The medical examiner recovered a lead bullet core fragment and a bullet jacket from Jordan's head.

Mark Hayes pleaded guilty to Jordan's murder and use of a firearm in the commission of murder.[1] Hayes testified against Knight, both at Knight's preliminary hearing and at trial.[2] According to Hayes, on August 16, 2002, he wanted to buy marijuana. Hayes saw Knight in Norfolk's First View neighborhood. Hayes, who had dated Knight's sister, knew Knight as "Ses." Knight got into Hayes's car and directed him to drive to a house where Knight talked with a woman named "Sheena." Hayes overheard Knight and Sheena talking about a place where there was a lot of marijuana. Knight then directed Hayes to drive to George "Geo" McAllister's[3] house, where McAllister entered Hayes's car. As Hayes drove, Knight and McAllister talked about robbing the place. Hayes saw that they had firearms, which Hayes described as "a .9 and a .40." At McAllister's direction, Hayes drove to a location beside some railroad tracks. Knight and Hayes exited

---

[1] The trial court sentenced Hayes to forty years' imprisonment with twenty-eight years suspended for Jordan's murder and to five years' imprisonment for the use of a firearm in the commission of Jordan's murder.

[2] The record indicates that Hayes testified at the preliminary hearing "on advice of counsel"; Hayes's counsel assured the general district court that he had conferred with Hayes and that "he'll tell the truth."

[3] The record indicates that McAllister was the first to confess but contains no details concerning how he came to the attention of the police. Detective Ford testified that McAllister gave them the names of two individuals, so the police conducted a photo line-up and he picked out pictures. Based on McAllister's statements, the police secured warrants against Hayes and Knight on November 26, 2002.

the car and walked along the railroad tracks to the side of some apartments.[4]  Knight gave Hayes "a .9 mm and he took the .40."  Knight told Hayes to knock on the door of 1539B Palmetto Street; Hayes did not know the occupants of the apartment.  When Jordan opened the door, Hayes asked him where "the weed" was, and Jordan closed the door on him.  Knight instructed Hayes to knock again.

As soon as Jordan opened the door, Knight "bum rushed" Hayes into the residence and ordered Jordan to the floor.  Knight "stomped" Jordan's head and kicked his leg, demanding to know where the marijuana was.  Jordan told Knight the marijuana was in a bag, which Hayes saw on the floor.  As Hayes looked in the bag, which had marijuana, Jordan broke free.  Jordan ran to the back of the apartment and jumped through the window of the back door.  Knight chased Jordan and shot at him through the window.  Hayes grabbed the bag and bolted out the front door, turned left, and ran along the side of the building.  Although Hayes saw some people as he fled, he "just ran" back to his car.  As he ran along the railroad tracks, Hayes heard more gunshots.  Hayes saw Knight a few minutes later at the car with a shoebox full of marijuana.  Knight told Hayes that he had shot Jordan in the back of the head.

McAllister drove them away from the scene.  Knight told Hayes not to worry because "his people would cover for him as an alibi."  They drove to Pleasant Park, and Knight gave Hayes and McAllister some marijuana.  McAllister remained in Pleasant Park, and Knight drove back to First View, where Hayes left him.  Hayes went home but decided that he needed a drink; he went to a club called "Night Moves."  When Hayes arrived at the club, Knight and Sheena were there.

John Doxey's cousins were visiting with him on August 16, 2002, at his residence at 1543B Palmetto Street, which was directly across from 1539B Palmetto Street.  Palmetto Street, Doxey explained, is a dead-end and railroad tracks run behind the duplex apartment buildings.  Doxey and his cousins had been watching a football game but when they heard what they thought was an argument outside, his cousins decided to leave.  As they walked to the car, Doxey heard three gunshots from the area of 1539 Palmetto

---

[4] McAllister remained with the car because he knew the people in the house.

Street. When they turned around to retreat to Doxey's house, he heard the loud "tisssh" of breaking glass. Doxey held his head down to protect it but looked back under his arm and saw a man about six feet tall "leaving out" of 1539B Palmetto. The man had a large-caliber chrome weapon, possibly a .9mm, in his right hand and a bag under his left shoulder. The man jumped down the steps, ran between the two buildings, and disappeared into the darkness; he did not fire any shots.

Doxey and his cousins reentered his home and as they walked toward his bathroom for safety, Doxey heard more gunshots. Doxey called 911; he reported shots fired and gave the address. Doxey felt that they waited a long time for the police to arrive. When Doxey and his cousins went back outside, Doxey saw a body in the street with a pool of blood around the head. Doxey and his cousins returned to his house, and he called 911 again. Doxey's cousins ultimately left before the police arrived. Doxey remained and spoke with Norfolk police officers that night. At Knight's trial, Doxey said that 1539B Palmetto had a reputation in the neighborhood for dope sales. The "primary" person who lived at 1539B was a female.

That same night, Augusta Coleman was visiting his girlfriend and their daughter at 1539A Palmetto Street. Coleman was familiar with Sheena and Cary "Little J" Darden, who lived at 1539B Palmetto. Coleman's girlfriend had been outside but she came into the apartment and said that she thought the apartment next door, 1539B Palmetto, "was getting jacked." Coleman heard a crash and several gunshots. The others in the apartment fled. Coleman remained, however, because his daughter was asleep. He went to the back bedroom and picked up the child but stayed inside because he could still hear shots. As he stood trying to decide whether to stay or go, the door "came open" and a man in the doorway pointed a gun at him. Coleman identified Knight as the person in the doorway with the gun.[5] Coleman announced, "I'm just here with the baby." Knight stood there for a second, then turned and walked away. Coleman eventually fled with the child.

---

[5] Coleman had not participated in a line-up or reviewed photographs.

Forensic Investigators Pederson and Henderson responded to the scene. Pederson recovered a bullet fragment from a drainpipe, which was located at the corner of 1533 Palmetto Street, a location consistent with having been fired from the rear of 1539B Palmetto. Pederson also found two bags of marijuana in the kitchen on a high chair. A bullet was lodged in the wall of the living room in 1539A Palmetto. Henderson later responded to a second location and collected one bullet and two bullet fragments from Coleman's car, which had two bullet holes in the windshield. Henderson also collected a gun-shot residue test on Coleman, which was negative. Investigator Martin responded to 1539B Palmetto on August 17, 2002, and collected three .40 caliber cartridge casings. An expert from the Department of Forensic Science testified that the bullet fragments recovered from Coleman's car and the bullet jacket recovered from Jordan's head had been fired from the same gun barrel.[6] The expert testified that the three .40 caliber casings Martin had found had been fired from the same gun. The police never found the firearm used to kill Jordan.

Clarence Coles, a convicted felon, met Knight in the Hampton Roads Regional Jail in March 2003. Coles was also from Norfolk, and he and Knight knew people in common. Knight told Coles that "he shot the dude" in the back of the head from a distance and gestured to show how he had shot the victim. Knight told Coles that his cousins were going to provide an alibi by saying he was at a club on the night of the murder. Coles contacted the police because of "the manner in which" Knight recounted the killing. Knight also made incriminating statements to another inmate from the Hampton Roads Regional Jail, Anthony Summerville, who was also a convicted felon. While Summerville was helping him find books in the jail library, Knight told Summerville that he was charged with murder. Summerville testified that Knight stated he pulled a gun on the victim during a "sting" and the victim "bucked," which Summerville understood to mean that during a robbery the victim attempted to run and Knight shot him. Knight stated something about a

---

[6] The expert was unable to determine whether the jacket fragments found in the driveway matched the fragment from the autopsy; they had similar characteristics, however.

.40 caliber gun and gestured to the back of his head to indicate where the victim had been shot. After the murder, Knight and his "homeboy" went to "Night Moves."

As forecast by Coles, Knight presented an alibi at trial. Knight's friend Selena Harris testified that she picked up Knight from Golden Corral, where he worked, at around 9:00 p.m. on August 16, 2002, because a group of friends had planned to go to "Night Moves" club to celebrate Robert Jones's birthday.[7] Harris took Knight to his apartment, where he changed and then he, Harris, and "some other people" went to "Night Moves," arriving around 10:30 p.m.

Jones rode to the club with Knight's girlfriend, Lori Ann "Candy" Carter, Felicia Hall, and Knight's sister, Julie Ann Gibbs. They arrived at the club between 10:00 and 10:15 p.m. Gibbs, however, forgot her ID, so could not get into the club. Carter took Gibbs home, and Gibbs saw Knight at the house getting ready to go to the club when she arrived.[8] Gibbs explained to Knight that she was unable to get into the club and offered to stay home with the children. Knight and Harris arrived at the club about ten to fifteen minutes after Jones, Carter, and Hall. The party-goers remained at the club until it closed sometime between 2:00 and 3:00 a.m. According to Jones and Carter, Knight stayed at the club "the whole time."

Harris recalled that Knight's hand was injured at the time and he had a sling; Harris was not sure which hand. Hall could not recall if Knight was wearing the sling on August 16, 2002, because "he could take if off to let his arm rest." Hall explained that Knight had injured his hand when he fell off a bike and that he had to have stitches in his hand; she did not recall the dates of the injuries. Carter stated that Knight had a sling on his arm for about two weeks because he fell off his bike; he sustained another injury to his right hand shortly after August 16, 2002. Carter did not remember how Knight sustained the injury that required stitches.

---

[7] Jones is Knight's brother.

[8] Carter did not testify about taking Gibbs home and stated that Knight arrived at the club fifteen minutes after she did.

The employment records from Golden Corral showed that although Knight was scheduled to work on August 16, 2002, he never clocked in. Knight's supervisor recalled a time when Knight arrived for work but was sent home because he was wearing a sling. The supervisor could not recall the date that Knight was sent home; however, the general manager testified that if he had followed procedure and arrived for work, he should have "swiped in." Knight's medical records showed that he sprained his right hand on August 2, 2002. He was given a sling and instructed to use it for four to five days. Knight appeared in the emergency room again on August 18, 2002, with a laceration to the back of his right hand along the knuckles. Knight received stitches and a splint for his hand.

Knight also presented testimony from two inmates who claimed they had spoken with Hayes in the Norfolk jail. Hayes told William Scott that the police "had him and his stick man," Knight—whom Hayes named—for murder. Scott testified that Hayes told him that he "ain't had nothing to do with it, but the homicide detective—he said, I ain't trying to go to prison. So the homicide detective told [Hayes] to work with them." According to Scott, Hayes declared that neither he nor Knight had anything to do with the murder. Scott did not know that Hayes had pleaded guilty to first-degree murder and use of a firearm in the commission of murder. Asani Gumbs testified that he knew Knight and Hayes; he said that he had discussed the crime on Palmetto Street with Hayes while in the Norfolk jail. When Gumbs asked Hayes "how he got mixed up in whatever," Hayes said "he didn't know why it happened." Hayes told Gumbs that, although he had acted alone in the murder, he would do "whatever it takes" because he could not "do all the time by himself." Gumbs also did not know that Hayes had pleaded guilty, or the circumstances of his surrender to the police and subsequent confession.

<u>PETITION FOR WRIT OF ACTUAL INNOCENCE</u>

Knight's claim of innocence rests on the purported recantations of Hayes and Coles; a "declaration" from McAllister; and his proffer that Summerville also has "recanted" his trial testimony but declined to provide a statement. Knight also relies on Detective Ford's federal convictions in pressing his claim of innocence. The fulcrum of Knight's argument is that without the testimony of Hayes, Coles, and

-7-

Summerville, and knowing of Ford's "unscrupulous tactics," no reasonable juror would convict him considering the lack of physical evidence connecting him to the offense.

ANALYSIS

"Code § 19.2-327.10 confers original jurisdiction upon this Court to consider a petition for a writ of actual innocence based on non-biological evidence." Phillips v. Commonwealth, 69 Va. App. 555, 562 (2018) (quoting Bush v. Commonwealth, 68 Va. App. 797, 803 (2018)). To be entitled to a non-biological writ of actual innocence, the petitioner must present evidence that was previously unknown or unavailable to him, and that could not have been discovered in the exercise of diligence before his conviction became final under Rule1:1(a). Code § 19.2-327.11(A)(iv) and (vi); Bush, 68 Va. App. at 804; In re Neal, 44 Va. App. 89, 90 (2004). In addition, the evidence upon which the petitioner relies must be "material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.11(A)(vii); Bush, 68 Va. App. at 805-06. Newly-discovered evidence that is "merely cumulative, corroborative or collateral" is insufficient. Code § 19.2-327.11(A)(viii); Bush, 68 Va. App. at 809.

A petitioner can only obtain a writ of actual innocence if we find by "clear and convincing evidence" that he has proven all of the allegations required under Code § 19.2-327.11(A)(iv) through (viii). Code § 19.2-327.13; In re Brown, 295 Va. 202, 221 (2018) (evaluating claim for a biological writ of actual innocence). "'[C]lear and convincing evidence' must be convincing enough to render the assertion to be proved '*highly probable* or *reasonably certain.*'" Id. at 228 (quoting Black's Law Dictionary 674 (10th ed. 2014)). The clear and convincing standard "cannot be met with evidence that leaves 'competing inferences "equally probable."'" Id. at 227 (quoting Edmonds v. Edmonds, 290 Va. 10, 22 (2015)). In evaluating a claim of actual innocence, this Court considers all of the factual information in its totality and tests it under the clear-and-convincing standard. Phillips, 69 Va. App. at 563-64; In re Brown, 295 Va. at 229. Thus, this Court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." In re Watford, 295 Va. 114, 123 (2018) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). Having

-8-

considered the entire record, we hold that Knight has not met this high burden, notwithstanding his reliance on Dennis.

The Supreme Court held in Dennis that "[d]etermining whether evidence is true requires factual findings," an endeavor that lies within the expertise of the trial courts, not the appellate courts. 297 Va. at 124, 130. Thus, "[i]n heavily fact-dependent cases . . . that turn on the materiality of new evidence offered by *new witnesses* whose credibility is not apparent from the record, the Court of Appeals should err on the side of ordering a circuit court evidentiary hearing." Id. at 130 (emphasis added). The Supreme Court instructed:

> Where a new witness has been found, who has not previously testified and who could not with due diligence have been discovered before the conviction became final, reference to the circuit court for an evidentiary hearing might be appropriate because of a trial judge's unique ability to see and hear the witness first hand and to evaluate his credibility from his appearance and demeanor while testifying. Witnesses who testified at the original trial, but later decide to recant their testimony, stand on a different footing.

Id. at 129 (quoting Haas v. Commonwealth, 283 Va. 284, 291-92 (2012)).

This case involves no new, previously unknown witnesses. The witnesses Knight presents previously testified, albeit McAllister testified only at Knight's preliminary hearing. Accordingly, Knight's witnesses "stand on a different footing" from the witnesses presented in Dennis; thus, Haas v. Commonwealth, 283 Va. 284 (2012), and Carpitcher v. Commonwealth, 273 Va. 335 (2007), control our review.

"[T]o be 'material,' within the meaning of Code § 19.2-327.11(A)(vii), evidence supporting a petition for a writ of actual innocence based on non-biological evidence must be true." Dennis, 297 Va. at 124 (quoting Carpitcher, 273 Va. at 345). "Manifestly, evidence that is false cannot be 'material' under the terms of the statute." Carpitcher, 273 Va. at 345. "The materiality inquiry is particularly important when a petition for a writ of actual innocence is based largely on a recantation because, '[u]nless proven true, recantation evidence merely amounts to an attack on a witness' credibility by the witness [himself].'" Id. at 128 (quoting Carpitcher, 273 Va. at 346). Although assessing whether evidence is true requires fact finding, this Court is vested with the statutory authority to "engag[e] in factual evaluation" *if*, in the exercise of our discretion, we

determine that further factual development is unnecessary. Id. at 127. We find that further factual development is unnecessary in this case.

"Traditionally, courts view recantations with 'great suspicion.'" Haas, 283 Va. at 292 (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984)). The Fourth Circuit similarly has admonished "that a recantation, particularly by an accomplice, should be received skeptically." Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir. 1975); see also United States v. Lighty, 616 F.3d 321, 375 (4th Cir. 2010) (quoting United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir. 1973)); United States v. Wilson, 624 F.3d 640, 664 (4th Cir. 2010) (same). Our skepticism of recantations "increases with the passage of time." Haas, 283 Va. at 292. "Recantation evidence appearing long after the trial has ended places the opposing party at a disadvantage similar to that which justifies statutes of limitations." Id. "Memories may have faded, witnesses may have disappeared or become incapable of testifying, physical evidence may be unrecoverable *and the recanting witness may have had ample time to acquire an extraneous motive to falsify his original testimony*." Id. (emphasis added) (footnote omitted). "Courts are justifiably leery of post-trial statements by codefendants purporting to exonerate a cohort." United States v. Bynum, 3 F.3d 769, 773 (4th Cir. 1993).

We assess the evidence and proffers individually under Code § 19.2-327.11(A), and then consider the totality of the evidence Knight has presented in support of his claim of innocence. Code § 19.2-327.13.

George McAllister

Knight proffers an unsworn "Declaration" from McAllister dated December 2, 2016, while McAllister was incarcerated at St. Bride's Correctional Center. The declaration recounts that Hayes came to McAllister's house to pick up a gun. Hayes was accompanied by an unidentified individual—who, like Knight, went by the nickname "Ses." McAllister offered them a drink and then asked for a ride to his girlfriend's house in Pleasant Park. On the way, Hayes said he had to make a stop to check on something. They parked by some railroad tracks, and Hayes and the unknown "Ses" exited the car and walked toward some bushes. McAllister did not see where they went but later heard gunshots, then Hayes and "Ses" came running back toward the car and told him to get in and drive. They drove a few blocks and then switched

-10-

drivers. Hayes drove McAllister to his girlfriend's house, gave him about an ounce of "weed" and told him "that the guy tried to run and they started shooting." McAllister states that when he was arrested in November 2002 for "a bunch of charges," he told the investigator who was questioning him that he had information about the incident on Palmetto Street, hoping to receive a benefit.

The declaration states that McAllister initially met with Ford briefly but did not speak with Ford until later, while he was "locked up on other charges." During the initial meeting, Ford had McAllister look through mug shots, but he did not identify anyone. McAllister later identified Knight as the "Ses" who was with Hayes because Ford had a photograph of Knight and told McAllister, "this is Ses, this is who Mark says is Ses." According to McAllister's declaration, Ford also told him what to write in his statement.[9] He states that Ford told him they could charge him with all the offenses related to Jordan's murder and that he would make sure McAllister "got the max" on his other pending charges.

We find that McAllister's declaration is not evidence that was "previously unknown or unavailable" to Knight or "such as could not, by the exercise of diligence, have been discovered or *obtained"* before Knight's conviction became final. Code § 19.2-327.11(A)(iv) and (vi) (emphasis added). The record establishes that McAllister was known to Knight and his counsel even before Knight's trial. The Commonwealth called McAllister to testify at Knight's preliminary hearing.[10] McAllister stated that he knew Knight as "Ses" and identified him in court. McAllister also confirmed that he knew Hayes. McAllister stated under oath, however, that he did not recall the night of August 16, 2002, had never been to the address where the murder occurred, and did not "even have any idea where Palmetto Street is." Knight's trial counsel did not subpoena McAllister for Knight's trial, although she had subpoenas issued to thirteen other witnesses, including two inmates at the Norfolk City Jail. We conclude that McAllister's declaration is not newly discovered because Knight could have called McAllister as a witness at trial. Code § 19.2-327.11(a)(iv); In re Walker, 44

---

[9] The trial record does not include McAllister's statement to the police.

[10] The record contains a transportation order for McAllister, which indicates that he was housed in the Norfolk City Jail at the time of Knight's preliminary hearing.

-11-

Va. App. 12, 13 (2004) (denying writ of actual innocence where counsel received psychological reports before conviction became final).

Moreover, even if McAllister's declaration were properly before the Court, we find it unpersuasive because it fails to account for other objective circumstances in the record. The declaration does not explain how Ford knew of Knight and Hayes before he spoke with McAllister. That omission is significant because the record establishes that McAllister spoke with Ford before Hayes and Knight did. The warrants for Knight's arrest were issued on November 26, 2002. Hayes turned himself in and gave his statement to the police on November 29, 2002, because he had heard that there was a warrant for his arrest. Thus, the claim that the police did not know Knight's identity until Hayes turned himself in is inconsistent with the timing of the charges.

We also note that McAllister testified at the preliminary hearing that he did not recall the night of August 16, 2002, had never been to the address where the murder occurred, and did not "even have any idea where Palmetto Street is." McAllister, nevertheless, confirmed that he knew Knight as "Ses" and that he "used to hang out with them [Knight and Hayes] all the time." McAllister advised defense counsel that he had known Knight for a long time, "that's my homeboy, you know what I'm saying." Thus, the record does not support the new claim that McAllister did not know Knight and impeaches the veracity of the proffered declaration.

Anthony Summerville

Knight asserts that, "on information and belief," Summerville lied at Knight's jury trial. Summerville purportedly told a private investigator that his testimony was false but did not want to sign an affidavit "because he was concerned about being charged with perjury." Knight urges the Court to accept his allegation as a proffer of evidence he would present at an evidentiary hearing.

We reject Knight's proffer that Summerville would testify under oath that he perjured himself at Knight's trial. By Knight's own account, Summerville declined to sign a statement because he was afraid that he could be charged with perjury. Under that circumstance, we cannot credit that Summerville would

state under oath that he had perjured himself.[11]  Moreover, for the reasons set forth below, the record does not support Knight's theory that Summerville and Coles concocted their testimony.

Mark Hayes

Knight proffers two affidavits from Hayes, both of which were executed in 2006.  The proffered affidavits provide different versions of the crime and Hayes's knowledge of it.  Thus, the current record contains three different versions of Hayes's account of the murder.  In his recorded statement to police and his preliminary hearing testimony, Hayes gave substantially the same account he gave at trial, as recited above.  In an affidavit sworn and subscribed to on January 6, 2006 (January affidavit), which Hayes purportedly filed in the trial court,[12] Hayes averred that he knew of Knight only "by word of mouth in the Street"; they were never acquaintances.  Hayes further stated that he did not know McAllister; therefore, he was not in the company of either man "on the day of the alleged crime."  Instead, the January affidavit claims that Hayes learned of the murder itself and Knight and McAllister's role in it from an unnamed "young lady" and her friends.  The affidavit claims that Ford coerced Hayes into telling the story that he testified to at Knight's trial and supplied him all the information about the crime.  By letter to the clerk of the trial court of June 19, 2006, however, Hayes asked that the January affidavit be "withdrawn" because he had "discovered that it is legally insufficient and not properly before the [c]ourt as required by law."  The letter stated that Hayes was giving notice that he intended to resubmit an affidavit.

On August 12, 2006, Hayes subscribed to a second affidavit, which he sent to the Norfolk Public Defender's Office (August affidavit).  In the August affidavit, Hayes expressly recanted his prior statements

---

[11] In Madison v. Commonwealth, Record No. 0942-18-1, we ordered an evidentiary hearing and certified questions to the trial court to assess the validity of a proffered confession procured by Madison's attorneys.  See Order of April 23, 2019.  At the evidentiary hearing, however, the witness invoked the Fifth Amendment.  See Transcript of June 24, 2019 hearing in the Circuit Court of the City of Virginia Beach at 51-54.  Cf. Teleguz v. Zook, 806 F.3d 803, 807 (4th Cir. 2015) (affirming denial of habeas corpus relief and noting that a purportedly recanting witness appeared at an evidentiary hearing on Teleguz's claim of actual innocence "but refused to testify").

[12] Knight alleges that the affidavit was filed in the trial court, but the January affidavit does not appear in the trial court record transmitted to this Court, either in the criminal file or the habeas corpus files.

to the police and his prior testimony. The August affidavit states that Hayes's statements to the police were made under threat of physical violence. Hayes further stated that the prosecutor and his trial counsel promised him leniency for his trial testimony; he testified to further his own penological interests and was not truthful. Hayes retracted and recanted "any statement and/or prior testimony" he gave against Knight that implicated Knight "in the events that transpired on the night of August 17, 2002, and the subsequent murder of Troy Jordan."

Hayes stated that he had personal knowledge to support his new claim that he and McAllister went to 1539B Palmetto on the night of August 17, 2002,[13] to purchase drugs. When they arrived, "Troy" let them into the house, but Troy and McAllister began arguing. The pair "struggled," McAllister "wrestled" Troy to the ground, and then began "stomping" Troy's head against the floor. Troy broke free, ran, and jumped through the window at the rear of the apartment. McAllister fired "random shots" out the window. Hayes later learned that Troy had died. McAllister told Hayes not to worry about the murder because "he knew some people who would put the word out on the street that someone else tried to rob Jordan and ended up killing him." Hayes stated that the first time he heard the name Kevin Knight was when Ford interrogated him on November 29, 2002, and he "assumed that this was who McAllister had pinned the crime on." Hayes went along with what Ford said because he was afraid that McAllister would harm him and his family.

The proffered affidavits clearly present two different—and irreconcilable—versions of Jordan's murder. Knight "acknowledges that there are inconsistencies between [Hayes's] two affidavits," but suggests that it "seems understandable" that Hayes "may want to minimize his responsibility in this murder." We disagree. Hayes entered guilty pleas to first-degree murder and use of a firearm in the commission of murder for his role in Jordan's murder in 2003. He was sentenced to forty-five years' imprisonment with twenty-eight years suspended. Minimizing his own involvement in Jordan's murder after he had already been convicted and sentenced will not benefit Hayes. We are unpersuaded by Hayes's "costless

---

[13] The offense date was August 16, 2002.

-14-

self-incrimination" that conflicts with his sworn trial testimony and his obligation under his plea agreement with the Commonwealth to "testify truthfully" at Knight's trial. Drew v. Scott, 28 F.3d 460, 463 (5th Cir. 1994).

Knight stresses that in both affidavits Hayes claims Ford threatened and coerced him to implicate Knight. Knight claims that this common point from the otherwise irreconcilable versions of the story, and the claim in both that Knight was not the shooter, are "the most salient points." The record, however, belies these points. In his signed, written plea agreement, Hayes[14] confirmed that "there have been no other inducements, promises, threats or coercion of any kind imposed upon the Defendant nor suggested to the Defendant by the Attorney for the Commonwealth or *any agent of the Commonwealth*." (emphasis added). Moreover, Knight's assertion that in both Hayes's recantations he was not the shooter is incorrect. The January affidavit actually implicates Knight in Jordan's murder because it recounts that others were saying that "Geo" and "Kevin" had murdered someone. Finally, the record does not support the assertion repeated in both affidavits that Hayes did not know Knight. Knight himself told the investigators that he knew Hayes; and Hayes had dated Gibbs. According to Gibbs, Knight and Hayes "had words" when Hayes broke up with her. In fact, Knight was so intimately acquainted with Hayes that he knew the details of an unrelated murder to which Hayes subsequently pleaded guilty.[15] Thus, the record, including Knight's own statements, refutes the bedrock claim common to both affidavits—that Hayes did not know Knight—and so provides a reasonable basis to question their validity.

Furthermore, Hayes's conflicting affidavits hinder Knight's ability to meet his burden to show which of Hayes's three accounts is true and, so, satisfy the materiality standard. See Carpitcher, 273 Va. at 345;

---

[14] As noted, Hayes was represented during the proceedings against him and his attorney also signed the plea agreement.

[15] Hayes was sentenced to forty-three years' imprisonment with fifteen years suspended for a murder that occurred in May 2002. Knight apparently provided the investigators with the initial lead in that murder because Hayes had recounted it to Gibbs.

Code § 19.2-327.11(A)(vii). In Carpitcher, "the circuit court was unable to determine whether [the victim's] recantation was true, and concluded that she was 'threatened, intimidated and coerced' to change her trial testimony." 273 Va. at 346. Considering the circuit court's factual findings, this Court held that Carpitcher had not met his burden of proving that the recantation testimony was true and the Supreme Court held that because "Carpitcher failed to meet his burden of establishing the first component of [the] two-part statutory burden, he failed to satisfy his burden of proof under the statute." Id. at 347.

We find that the same reasoning applies to the present case without the need for an evidentiary hearing. Conspicuously absent from Knight's submissions is any explanation for the circumstances under which Hayes's affidavits were procured. The record before this Court, however, establishes that Knight threatened Hayes repeatedly. Knight's counsel cross-examined Hayes regarding his plea agreement with the Commonwealth and statements in which he purportedly claimed that Knight was not involved in Jordan's murder. Hayes explained that he did not want to testify against Knight because he had been threatened "a couple of times about" testifying against Knight. At Hayes's sentencing hearing, his counsel noted Hayes's cooperation by turning himself in and testifying against "the triggerman."[16] Counsel expressly represented to the sentencing judge that Hayes testified "under threat" at the preliminary hearing. Considering the documented history of Knight's threats against him, we find that Hayes's irreconcilable accounts do "no more than establish that [he] spoke falsely on one or more occasions." Id. at 346.

Clarence Coles

Knight has submitted an unsworn "Declaration" from Coles dated October 24, 2016, while he was incarcerated at Wallens Ridge State Prison.[17] In the declaration Coles claims that he and Summerville made

---

[16] The Commonwealth acknowledged Hayes's cooperation and advised the trial court that considering his cooperation, the Commonwealth had exercised its discretion not to charge Hayes with Jordan's robbery and the related firearm offense. The Commonwealth also advised the trial court that there was no plea agreement and no cap on the possible sentence, and that it was the "day of reckoning" for Hayes.

[17] Knight was incarcerated at Wallens Ridge State Prison in 2005 and 2007, when he filed his state habeas corpus petitions. The record does not disclose whether Coles and Knight were at Wallens Ridge at the same time.

up their testimony against Knight and practiced it repeatedly while they were housed together at the Hampton Roads Regional Jail. According to the declaration, Knight did not admit to killing anyone or having anything to do with the crime. Coles claims that after he and Summerville decided to use Knight to curry favor with the Commonwealth, Summerville contacted "his girl," who then contacted prosecutors on their behalf. But Coles is "not exactly sure" whether he also contacted prosecutors himself. During his meetings with the police, they "filled in all the details about the crime" for Coles; he did not learn any details of the crime from Knight. Once he had the story down, the police called in the prosecutor, the same prosecutor who was handling Coles's probation violation. The declaration claims that Coles wrote to the prosecutor while he was incarcerated for an offense from Virginia Beach and stated that he had lied at Knight's trial, but the prosecutor never responded.

Coles met with Jennifer Givens, Knight's counsel, and two law students on October 24, 2016, and told them everything in the declaration. Coles states that he was not forced or coerced in any way to talk with Givens and the law students or to sign the declaration.[18]

The proffered declaration is inconsistent with Summerville's testimony at Knight's trial that he and Coles were not housed in the same block at Hampton Roads Regional Jail, although he knew Coles. Summerville expressly stated that he had not discussed his testimony with Coles. As with Hayes, the record discloses that Knight had threatened Coles repeatedly about testifying. Knight's trial counsel vigorously cross-examined Coles and challenged him with the contents of a letter that stated Coles did not know anything about Knight's case. Coles stated that Knight had threatened him regarding his testimony. Coles told Detective Mayer[19] on April 2, 2003 that Knight intended to claim that he had been at a nightclub at the time of the murder, several weeks before Knight filed his notice of alibi. Thus, Coles's statement to police

---

[18] The declaration does not state whether there were any inducements for Cole's statement, or whether Coles was advised that he could be subject to prosecution if he perjured himself at Knight's trial.

[19] At trial Coles stated that he gave his statement to Ford; however, the document indicates that Coles made his statement to Mayer.

demonstrated that he had non-public information before Knight asserted his defense, making it unlikely that he and Summerville contrived their testimony.

Detective Ford

Knight claims that Ford is responsible for his wrongful conviction. Without any elaboration or explanation, he alleges that Ford requested $10,000 from him and when he refused, "Ford employed his oft-used tactics, lining up snitches and coercing witnesses" to convict Knight. But now, "through the recantation of critical Commonwealth witnesses, the case concocted by Ford and pursued by the Commonwealth has been fatally undermined."

This Court acknowledges Ford's federal convictions for conspiracy to commit extortion, extortion, and making false statements. See United States v. Ford, 470 Fed. Appx. 146, 146 (4th Cir. 2012). We also acknowledge the United States District Court's finding that "Ford has a proven history of eliciting false confessions; he had previously been demoted for securing a series of false confessions." Williams v. Brown, 208 F. Supp. 3d 713, 735 (E.D. Va. 2016). We in no way condone or excuse Ford's deplorable conduct in those cases. Notwithstanding our disdain for Ford's conduct in those cases, it is not sufficient in *these* proceedings for Knight—or any other petitioner—to plead merely conclusory allegations that Ford's "oft-used tactics" were employed in his case.[20] Cf. Fitzgerald v. Bass, 6 Va. App. 38, 44 (1988) (en banc) (holding that "mere conclusions or opinions of the pleader will not suffice to make out a case" in habeas corpus proceedings) (quoting Penn v. Smyth, 188 Va. 367, 370-71 (1948)). Instead, Knight must present this Court "clear and convincing evidence" to sustain his claim. Code § 19.2-327.13. "Evidence is '[s]omething (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an

---

[20] See Juniper v. Warden of the Sussex I State Prison, 2010 WL 5281621 (Va. Cir. Ct. 2010) (rejecting claim during capital habeas corpus proceedings that "[t]he general circumstances described in the [federal] indictment are similar to Investigator Ford's actions in Mr. Juniper's case and provide good cause for discovery"); Porter v. Warden of the Sussex I State Prison, 2010 WL 5281620 (Va. Cir. Ct. 2010) (same).

-18-

alleged fact . . . .'" In re Pierce, 44 Va. App. 611, 612 (2004) (quoting In re Rhodes, 44 Va. App 14, 15 (2004)) (alteration in original). Knight's bare allegations concerning Ford are not evidence.

Totality of the Evidence Review

Code § 19.2-327.13 requires the Court to "examine the 'probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial.'" Bush, 68 Va. App. at 808 (quoting In re Watford, 295 Va. 114, 124 (2018)). "Thus, we are required to look beyond whether the evidence is sufficient to sustain the conviction; we must also examine the likelihood of a reasonable juror finding the petitioner guilty beyond a reasonable doubt once all of the evidence has been fairly considered." Id. (quoting Watford, 295 Va. at 124). That is, the newly-supplemented evidentiary record "is reviewed in its totality," and we evaluate its probative force "under the clear-and-convincing standard." Brown, 295 Va. at 229. The Court must determine whether a petitioner is entitled to a writ of actual innocence "from a hypothetical new trial in which a rational factfinder hears all of the evidence in the aggregate . . . ." Id. (quoting Watford, 295 Va. at 125).

"It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt." Watford, 295 Va. at 124. Instead, a petitioner's evidence "must establish such a high probability of acquittal, that [the reviewing court] is reasonably certain that no rational fact finder would have found him guilty." Id. Upon review of the entire record, considering the old evidence together with the new, we find that Knight has not met his burden to show by clear and convincing evidence that no rational trier of fact would have found proof of guilt beyond a reasonable doubt. Code § 19.2-327.13. Taken together, a reasonable jury likely would give considerable weight to the unrecanted testimony of the two disinterested eyewitnesses, Doxey and Coleman. We also find that a reasonable jury likely would be unpersuaded by stale recantations that are inconsistent with other record evidence, including Knight's own evidence of his close relationships with both Hayes and McAllister. Moreover, the record provides reason for caution in evaluating the proffered evidence considering the numerous threats Knight

-19-

made against Hayes and Coles before his trial. Furthermore, a reasonable jury likely would consider Knight's failed alibi to conclude that he had attempted to cover up his role in Jordan's murder.

Finally, in considering the totality of the record before us, we note that Knight avers in his petition that the evidence upon which he relies became known or available to him in "2016-2018" through "investigation of my case by the Innocence Project at UVA School of Law" and that he "could not have secured the new evidence without the assistance of counsel." We note, however, that the proffered statements from Hayes, were executed in 2006 and indicate that both Knight and Knight's trial counsel received copies.[21] In addition, Ford was indicted in the United States District Court for the Eastern District of Virginia in May 2010; a jury convicted him on October 27, 2010; and, the district court sentenced him to 150 months' imprisonment on February 25, 2011. See Ford, 470 Fed. Appx. 146. Thus, Ford's convictions and sentence had been a matter of public record for at least five years before "2016-2018." We hold that a rational, properly instructed jury would consider the demonstrably false assertions that Knight did not learn of the evidence upon which he now relies until "2016-2018" in assessing the credibility of Knight's claim of innocence and would weigh them against Knight. Cf. Brown, 295 Va. at 231 (denying biological writ of actual innocence and finding it "highly unlikely" that a jury would sympathize with his recanted confessions to the Parole Board and that a "typical jury" would find that circumstance diminishe[d] "his newly articulated claim of actual innocence").

Accordingly, we hold that Knight is not entitled to the writ and dismiss his petition.

This order shall be published.

A Copy,
Teste:

*original order signed by the Clerk of the
Court of Appeals of Virginia at the direction
of the Court*
Clerk

---

[21] Knight appended the August affidavit to a state petition for a writ of habeas corpus, which he filed in the trial court in 2007.